**John M. KENNEY and Kenney Orthopedic, LLC,**
**Appellants,**

v.

**HANGER PROSTHETICS & OR-THOTICS, INC. and Michael Adams, Appellees.**

No. 2006–CA–000939–MR.

Court of Appeals of Kentucky.

Sept. 21, 2007.

Rehearing Denied May 7, 2008.

Discretionary Review Denied by Supreme Court Dec. 10, 2008.

---

1. As was the circumstance here, where the defendant was, at best, marginally competent.

James M. Morris, Sharon K. Morris, Lexington, KY, for appellants.

Margaret A. Miller, Theodore R. Martin, Lexington, KY, for appellees.

Before MOORE, STUMBO, and VANMETER, Judges.

## OPINION

VANMETER, Judge.

John M. Kenney appeals from the Fayette Circuit Court's order granting summary judgment in favor of Hanger Prosthetics & Orthotics, Inc. (Hanger). Kenney argues on appeal that the trial court erred by failing to allow him to amend his complaint and by granting summary judgment in Hanger's favor on his breach of contract claim, and that the trial judge erred by failing to recuse from the case. For the following reasons, we affirm.

Hanger, a company which provides prosthetic and orthotic services, employed Kenney from June 1990 until he resigned in November 2001. Thereafter, Kenney formed his own business, Kenney Orthopedic. In February 2002, Kenney filed a complaint alleging that Hanger and one of its employees, Michael Adams, had interfered with his venture by advising potential customers that Kenney was barred from competing with Hanger in the Lexington area. Kenney also alleged that Hanger and Adams published statements that Kenney engaged in theft of time and services, and embezzled money while he worked for Hanger. Kenney sought a temporary injunction and alleged breach of contract based on the allegations that Hanger failed to pay him certain compensation due under the employment agreement, and that they misrepresented the employment agreement to others. Kenney also alleged defamation and tortious interference with a prospective advantage.

The trial court subsequently granted summary judgment in Hanger's favor regarding Kenney's claims of defamation and tortious interference with a prospective advantage. Kenney then moved the court to allow him to amend his complaint to in-clude several additional causes of action; however, the trial court denied Kenney's motion.

The matter proceeded regarding Kenney's claim of breach of contract, under which he alleged he was owed three distinct payments: a bonus under a 30% Incentive Plan, compensation under a summer 2001 stock option agreement, and 4% commission. The trial court eventually granted summary judgment in Hanger's favor on the former two claims; the latter claim was set for trial. After the trial resulted in a hung jury, Hanger moved for summary judgment in its favor on Kenney's claim for 4% commission. The trial court granted Hanger's motion. This appeal followed.

## I. Motion to Amend Complaint

Kenney argues that the trial court erred by failing to allow him to amend his complaint to include several causes of action. We will address each in turn.

Pursuant to CR[1] 15.01, under circumstances such as those present herein, "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." In determining whether to grant a motion to amend a party's complaint, a circuit court "may consider such factors as the failure to cure deficiencies by amendment or the futility of the amendment itself." *First National Bank of Cincinnati v. Hartman,* 747 S.W.2d 614, 616 (Ky.App.1988). Other factors include whether amendment would prejudice the opposing party or would work an injustice. *See Shah v. American Synthetic Rubber Corp.,* 655 S.W.2d 489, 493 (Ky.1983). Ultimately, whether a party may amend his complaint is discretion-

---

1. Kentucky Rules of Civil Procedure.

ary with the circuit court, and we will not disturb its ruling unless it has abused its discretion. *Lambert v. Franklin Real Estate Co.,* 37 S.W.3d 770, 779 (Ky.App.2000).

## A. Interference with Prospective Contractual Relations

■ First, Kenney argues that the trial court erred by failing to allow him to amend his complaint to include a cause of action for the tort of interference with prospective contractual relations. We disagree.

The trial court likened this proposed count to Kenney's allegation in his initial complaint of tortious interference with a prospective business advantage. Since the trial court had already granted summary judgment in Hanger's favor on the initial count, it denied Kenney's motion to amend his complaint to include the proposed count.

Although Kenney called the causes of action in his initial complaint and proposed amended complaint by different names, it is clear that they referenced the same cause of action. Indeed,

> [t]he tort of interference with a prospective advantage is plagued with the absence of a uniformly recognized terminology. It has been referred to as the tort of interference with a business relationship, inducing refusal to deal, interference with a prospective economic advantage, interference with advantageous relations, interference with reasonable economic expectancies, or interference with prospective business expectancies. . . . The American Law Institute has named the tort "Intentional Interference with Prospective Contractual Relation."

William S. Haynes, *Kentucky Jurisprudence,* Torts § 13–1 (1987). Both of Kenney's counts clearly referenced Hanger's interference with Kenney's prospective business relationships, even if the allegations in his proposed amended complaint were more specific in that they referenced actual businesses with which Kenney had the expectation of business relationships. Because the trial court already had granted summary judgment in Hanger's favor on the count in Kenney's initial complaint, it did not err by failing to allow Kenney to amend his complaint to include the count of interference with prospective contractual relations.[2]

## B. Defamation *Per Quod*

■ Next, Kenney argues that the trial court erred by failing to allow him to amend his complaint to include a cause of action for the tort of defamation *per quod.* We disagree.

■ Again, the trial court denied Kenney's motion to amend his complaint to include a count for defamation *per quod* as it had already granted summary judgment in Hanger's favor on Kenney's defamation allegations in his initial complaint. Defamatory words may be action *per se,* or *per quod. Stringer v. Wal–Mart Stores, Inc.,* 151 S.W.3d 781, 794 (Ky.2004). The difference between defamation *per se* and defamation *per quod* is that, in the former, damages are presumed and, in the latter, the plaintiff must prove special damages. *Id.* As such, the trial court did not err by failing to allow Kenney to amend his complaint to include the count of defamation *per quod* as it had already granted summary judgment in Hanger's favor on Ken-

---

**2.** We need not address whether the trial court erred by granting summary judgment in Hanger's favor on Kenney's initial claim of tor-

tious interference with a prospective advantage because Kenney has not raised the issue on appeal.

ney's initial defamation count.[3]

## C. Unfair Competition/Trade Practices

■ Next, Kenney argues that the trial court erred by failing to allow him to amend his complaint to include a cause of action for the tort of unfair competition/trade practices. We disagree.

The court in *Covington Inn Corp. v. White Horse Tavern*, 445 S.W.2d 135, 139 (Ky.1969), expressly set forth that:

> unfair competition consists of either (1) injuring the plaintiff by taking his business or impairing his good will, or (2) unfairly profiting by the use of the plaintiff's name, or a similar one, in exploiting his good will. Underlying the whole theory is the matter of actual or intended deception of the public for business reasons.

Originally, unfair competition "dealt generally with the palming off of one's goods as those of a rival trader. Thus, the essence of common-law unfair competition is the bad-faith misappropriation of the labors and expenditures of another likely to cause confusion or to deceive purchasers as to the source or the origin of goods." 54A Am.Jur.2d, *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 1107 (1996) (footnotes omitted). Unfair competition has since been "extended to outlawing 'parasitism' under the principle that one may not appropriate a competitor's skill, expenditures, and labor." *Id.*

Here, the trial court did not err by failing to permit Kenney to amend his complaint to include this count as he has not alleged any facts which would support such a cause of action. Hanger simply did not "palm off" Kenney's goods as its own

or misappropriate any of Kenney's efforts. While we recognize that courts have held unfair competition encompasses many actions, *see id.*, Kenney has not cited, and we have not found, any Kentucky state cases which have held actions like Hanger's here to constitute unfair practices.

Kenney has cited a Kentucky federal case, *Insect–O–Lite Co. v. Hagemeyer*, 151 F.Supp. 829 (E.D.Ky.1957), which we are not persuaded compels a different result. In that case, Beirne promoted and sold the Insect–O–Lite Company's vapor lamps, which were designed to attract and destroy insects. *Id.* at 831. Thereafter Beirne formed, with two other individuals, Hagemeyer Chemical Co., which used Beirne's knowledge to copy identically the Insect–O–Lite and sell the product under the name Insect Light. *Id.* The district court held that Hagemeyer did not violate Insect–O–Lite's trademark, and that it had the right to produce and sell the Insect Light; however, Hagemeyer could only do so "in such a way that the purchasers of the product [were] not deceived into the belief that they [were] purchasing the product of [Insect–O–Lite]. The defendants cannot palm off their product by positive misrepresentation nor by negative conduct which is calculated to mislead." *Id.* at 833. Ultimately, the district court held that Hagemeyer had engaged in unfair competition, as it was clear that Beirne attempted to deceive Insect–O–Lite's former customers and to "palm off" Hagemeyer's goods as Insect–O–Lite's goods "by representing that [Insect–O–Lite] was no longer in existence and that [Hagemeyer's] goods were an improvement by [Insect–O–Lite] in the item Insect–O–Lite." *Id.* at 834.[4]

---

**3.** Again, we need not address whether the trial court erred by granting summary judgment in Hanger's favor on Kenney's initial defamation claim because Kenney has not raised the issue on appeal.

**4.** We note that the federal district court's decision in *Insect–O–Lite* was appealed to the

The fact that the *Insect–O–Lite* opinion emphasized the fact that Beirne represented that Insect–O–Lite was no longer in existence does not change the character of a cause of action for unfair competition. Nor does it give rise to a cause of action in this matter, where Kenney alleges that Hanger represented to others that Kenney had moved from the state. *Insect–O–Lite* is a classic "palming off" situation; there is no similar element in the matter now before us.

## D. Slander of Title, Trade Libel/Disparagement, Injurious Falsehood

Kenney's next argument is that the trial court erred by failing to allow him to amend his complaint to include causes of action for slander of title, trade libel/disparagement, and injurious falsehood. One commentator has explained the relationship among these torts as follows:

> Corporations and other businesses can and do recover for libel or slander when they have been defamed by charges such as crime or fraud. But defamatory charges commonly made against individuals—adultery, for example—have little relevance to corporations and many of the imputations about corporations are harmful without being defamatory. When the publication asserts that the corporate product is defective, inadequate, or harmful without asserting personal defamation, the traditional view regards the claim as essentially different from the claim for defamation. The same is true if the publication merely says that the plaintiff has gone out of business. This different claim goes under the general name of injurious falsehood. When the publication attacks a product, it is also called trade libel or commercial disparagement. When the publication attacks title to property rather than quality of a product, the claim is likely to be called slander of title.

Dan B. Dobbs, *The Law of Torts* § 407 (2001) (footnotes omitted). We will address each of these related causes of action in turn.

### 1. Slander of Title

■ Slander of title involves disparaging and false assertions about one's ownership of land or other property. Paul T. Hayden, *A Goodly Apple Rotten at the Heart: Commercial Disparagement in Comparative Advertising as Common–Law Tortious Unfair Competition*, 76 Iowa L.Rev. 67, 74 (1990). This court has explained that in order for one to prevail on a claim of slander of title, he must prove:

> that the defendant has knowingly and maliciously communicated, orally or in writing, a false statement which has the effect of disparaging the plaintiff's title to property; he must also plead and prove that he has incurred special damage as a result.

*Bonnie Braes Farms, Inc. v. Robinson*, 598 S.W.2d 765, 766 (Ky.App.1980). Since there was no title to property involved in the allegations in the matter now before us, the trial court did not err by failing to permit Kenney to amend his complaint to include this count.

### 2. Trade Libel/Disparagement

■ Trade libel involves disparaging and false assertions about the quality of one's property rather than title to it. 76 Iowa L.Rev. at 74. One is liable for trade

United States Court of Appeals, Sixth Circuit. In *Hagemeyer Chemical Co. v. Insect–O–Lite Co.*, 291 F.2d 696 (6th Cir.1961), the Sixth Circuit affirmed the district court's decision in part, but reversed in part insofar as the district court had issued judgment against not only Beirne, but also the two individuals with whom Beirne formed Hagemeyer.

libel/disparagement when he publishes a false statement that disparages "the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property." *Restatement (Second) of Torts* § 626 (1977) (incorporating § 623A). The trial court did not err by failing to permit Kenney to amend his complaint to include this claim since he did not allege facts to support a cause of action for trade libel. Again, Kenney did not allege that Hanger disparaged the quality of any of his property.

### 3. Injurious Falsehood

■ Injurious falsehood is defined as follows:

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

*Restatement (Second) of Torts* § 623A (1977). This "ill-defined tort is related to various other torts such as defamation, libel, trade libel, slander, slander of title, and interference with commercial or economic relations." *General Electric Co. v. Sargent & Lundy*, 916 F.2d 1119, 1124 (6th Cir.1990).

The trial court did not err by failing to permit Kenney to include injurious falsehood in his complaint because Kentucky courts have never recognized the tort.

*CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1089 (W.D.Ky.1995) (Kentucky courts would not create such a new cause of action); *see Sargent & Lundy*, 916 F.2d at 1124–25 (district court's conclusion that Kentucky would recognize such a tort was not appealed). Further, to the extent that Kenney urges us to now recognize it, we decline to do so. Keeton has opined that "the injurious falsehood claim should be regarded merely as one form of intentional interference with economic relations[.]" *CMI, Inc.*, 918 F.Supp. at 1088 (citing W. Keeton, *Prosser and Keeton on the Law of Torts* § 128, at 964 (5th ed.1984)). The facts of the matter now before us seem to lend themselves easily to an action for interference with a prospective business advantage, which is a recognized tort in Kentucky. *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 857–859 (Ky.1988) (adopting §§ 766B, 767, and 773 of the *Restatement (Second) of Torts* and recognizing that "intentional and improper interference with the prospective contractual relations of another gives rise to liability.") Thus, we decline to adopt a new tort to fit the situation when it seems to be encompassed by an already-recognized tort, albeit one that we cannot review since the trial court's ruling in Hanger's favor on that claim is not before us on appeal.

### E. Illegal Restraint of Trade and Commerce

■ Kenney also argues that the trial court erred by failing to allow him to amend his complaint to include a cause of action for the illegal restraint of trade or commerce under KRS[5] 367.175. We disagree.

---

**5.** Kentucky Revised Statutes.

KRS 367.175, which prohibits the "restraint of trade and formation of monopolies[,]" *Brandon v. Combs,* 666 S.W.2d 755, 757 (Ky.App.1983), is based upon Sections 1 and 2 of the Sherman Anti–Trust Act. *Mendell v. Golden–Farley of Hopkinsville, Inc.,* 573 S.W.2d 346, 348 (Ky.App.1978). Because "every agreement concerning trade and every regulation of trade restrains trade," the Supreme Court has held that Section 1 of the Sherman Act makes "illegal only those contracts and combinations that constitute unreasonable restraints of trade." 54A Am.Jur.2d, *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 47 (1996). A restraint of trade may be adjudged unreasonable if it is *per se* unreasonable or violates the rule of reason. *Id.* Examples of *per se* unreasonable conduct include price-fixing arrangements, tying arrangements, agreements among competitors to divide markets or to allocate customers, group boycotts, and agreements to limit production. *Id.* at § 51. Kenney has clearly not alleged any of these practices or any comparable practices. As for a restraint which violates the rule of reason, "showing merely injury to oneself as a competitor is insufficient." *Weight–Rite Golf Corp. v. U.S. Golf Ass'n,* 766 F.Supp. 1104, 1110 (M.D.Fla.1991). Thus, the trial court did not err by failing to permit Kenney to amend his claim in this regard.[6]

## II. Summary Judgment in Hanger's Favor

Kenney argues that the trial court erred by granting summary judgment in Hanger's favor on his breach of contract claim, under which he argued that he was owed three distinct payments: a bonus under a 30% Incentive Plan, 4,200 shares of stock, and 4% commission. We will address each in turn.

## A. Bonus Under 30% Incentive Plan

Under Hanger's 30% Incentive Plan, 30% of the total cash collected by an office branch collected in a calender year was placed in a bonus pool. The portion of the pool the employees would receive as a bonus was then calculated, depending upon their ability to manage certain expenses, including materials and labor. The allocation of the bonus among the employees of a particular branch was recommended by the practice manager, reviewed by the market leaders, and then submitted to payroll.

While the plan was a yearly incentive plan, semiannual payouts were made: the first being 75% of the amount earned for the first six months of the year; the second being the amount earned for the full year minus the amount paid after six months. In some instances, this resulted in employees owing money at the end of the year.[7] Kenney maintains that when he resigned in November 2001, he was entitled to his bonus for 2001, as it had accrued until that point. Several Hanger managers testified in depositions, however, that whenever Hanger issued the bonuses, it did not make payouts to individuals who were no longer employed with the company, although they could not find a written policy which expressly stated such.

On appeal, Kenney refers to the following language from "his 30% Incentive Plan" as entitling him to compensation:

---

**6.** We note that there are numerous complex issues to consider in evaluating whether there has been a violation of the Sherman Act. We have only undertaken a small portion of this evaluation sufficient to affirm the trial court's decision in this regard.

**7.** The losses were apparently carried over for one year.

payout to be *semiannual* with the first payout at 75% of the **amount earned,** if any, for the first six months. The year end payout will be **the amount earned** for the *full year* minus the amount paid after six months.

Although Kenney does not cite to the record in support of this quotation, we have found this language in a document attached to one of Hanger's summary judgment motions: a 30% Incentive Plan CY2000 memorandum from HPO Executive Committee to Practice Managers, dated February 29, 2000. This informal memorandum, however, does not supplement the employment agreement Kenney signed with Hanger in August 1995, which provides in part as follows:

> Upon termination of this Agreement for any reason, Employee agrees that payment of salary earned, and reimbursement of reasonable and necessary travel expenses incurred, to the date of such termination shall constitute full satisfaction of all the Company's financial obligations to the Employee under this Agreement.

It is undisputed that the compensation sought by Kenney is a bonus rather than part of his salary. And as set forth above, Hanger managers testified that under the plan the company did not make payouts to people who were no longer employed by the company. Thus, there was no evidence that for purposes of KRS 337.010(1)(c),[8] Kenney "earned" the bonus at a time before the bonuses were distributed. Accordingly, the trial court did not err by granting summary judgment in Hanger's favor in this regard.

## B. Stock

 Kenney also argues that the trial court erred by granting summary judg-

ment in Hanger's favor on his claim that he was entitled to 4,200 shares of stock because Karl Fillauer, a market leader with Hanger, admitted to promising him these shares. We disagree.

As Hanger points out in its brief, Kenney initially claimed that he and all of the other managers were offered 4,200 stock options at $1.65 in the spring of 2001, and that Fillauer admitted to this offer in his deposition. Kenney did not exercise the options because Hanger neither gave him the appropriate paperwork to do so while he was employed, nor provided the paperwork to him when he tried to exercise the option after his termination.

However, Kenney subsequently abandoned this position regarding stock options, arguing instead that he was entitled to 4,200 shares of stock because they were promised to him by Fillauer. As this contention is inconsistent with both Fillauer's testimony and Kenney's initial assertions, Kenney's subsequent argument that Fillauer promised him 4,200 shares of stock lacks merit, and the trial court did not err by granting summary judgment in Hanger's favor on the issue.

## C. 4% Commission

 Kenney argues that the trial court erred by granting summary judgment in Hanger's favor on his claim that he was entitled to 4% commission. We disagree.

Part of Kenney's salary was commission. Members of Hanger's management testified that Kenney was paid a 4% commission on the money his practice collected on a monthly basis. Further, Kenney introduced at trial a Personnel Action Form which indicated that in March 1999, his

---

**8.** That certain members of Hanger's management used the word "earned" in their testimony is not conclusive, for purposes of KRS 337.010(1)(c), as to the legal issue of when Kenney's bonuses were earned.

commission changed from 4% of his total sales to 4% of his collections. Kenney argues that he nevertheless was entitled to commission on all sales in which he participated prior to his resignation, even if the money for those sales was not collected until after his resignation. Given the clear personnel statement that commissions were not earned until money was collected, we cannot say that the trial court erred by granting summary judgment in Hanger's favor on this count.

### III. Judicial Bias

 Finally, Kenney argues that the trial judge erred by failing to recuse from this case. We disagree.

As the Kentucky Supreme Court has explained, a party or counsel may seek to disqualify or recuse a judge from proceeding further in a matter either by filing an affidavit pursuant to KRS 26A.020, by filing a motion with the judge pursuant to KRS 26A.015, or by filing both. *Nichols v. Commonwealth*, 839 S.W.2d 263, 265 (Ky. 1992). Here, Kenney's counsel filed an affidavit pursuant to KRS 26A.020(1) requesting that the Chief Justice designate a special judge for the matter.[9] The Chief Justice denied Kenney's request, finding that the affidavit did not demonstrate any disqualifying circumstances. Kenney did not, however, move for the trial judge to recuse. Indeed, Kenney's counsel stated in his affidavit to the Chief Justice that he chose to only utilize KRS 26A.020 because he had "tried to use a formal Motion to Recuse in another matter before Judge Isaac and realize[d] that such a request is futile. Judge Isaac's animosity and bias against me is such that she would simply refuse to recuse[.]" Accordingly, there

was no action by the trial court and no alleged error for this court to review. *Kaplon v. Chase*, 690 S.W.2d 761, 763 (Ky. App.1985) ("function of the Court of Appeals is to review possible errors made by the trial court, but if the trial court had no opportunity to rule on the question, there is no alleged error for this court to review.")

The Fayette Circuit Court's order is affirmed.

ALL CONCUR.

---

9. We note that Kenney's counsel did not file this affidavit until September 2005, over three and one-half years after he initiated the action in February 2002.