NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0415n.06

No. 18-5900

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ACT FOR HEALTH, dba Professional Case )
Management; PROFESSIONAL CASE )
MANAGEMENT OF KENTUCKY, LLC, )
                                          )
      Plaintiffs-Appellants, )
                                          )
      v. )        ON APPEAL FROM THE
                                          )        UNITED STATES DISTRICT
UNITED ENERGY WORKERS HEALTHCARE )        COURT FOR THE WESTERN
CORP; KENTUCKY ENERGY WORKERS )        DISTRICT OF KENTUCKY
HEALTHCARE, LLC; BRIGHTMORE HOME )
CARE OF KENTUCKY LLC; JOHN FALLS, an )
individual; TRAVIS SHUMWAY, an individual; )
CHAD SHUMWAY, an individual; and )
NICHOLAS BAME, an individual, )
                                            )
      Defendants-Appellees )

---

**BEFORE: COOK, McKEAGUE, and WHITE, Circuit Judges.**

      **HELENE N. WHITE, Circuit Judge.** Plaintiff Act for Health, dba Professional Case

Management, and its wholly owned subsidiary, Professional Case Management of Kentucky

("PCMK," and collectively with Act for Health, "PCM" or "Plaintiffs"), appeal the district court's

dismissal of their amended complaint for failure to state a claim. Plaintiffs compete with three

affiliated corporate defendants—United Energy Workers Healthcare Corp. ("UEW"), Kentucky

Energy Workers Healthcare, LLC ("KEW"), and Brightmore Home Care of Kentucky

("Brightmore")—in providing home-health services. PCM alleges that UEW and KEW were

operating without the required license to provide home-health services and, after the Kentucky

Officer of Inspector General investigated them, Defendants John Falls, Travis Shumway, and Chad Shumway formed Brightmore to continue to illegally service UEW and KEW clients. PCM also alleges that UEW and KEW solicit PCM's patients and offer free, unrelated services (such as lawn care) to induce patients to switch from PCM, and also misclassify their employees as independent contractors to gain an advantage in the market.

PCM filed this diversity action alleging several state-law claims, including unfair competition, tortious interference with contract and/or prospective business relations, and civil conspiracy. Finding no error in the district court's dismissal of PCM's First Amended Complaint for failure to state a claim, we affirm.

## I.

The federal Energy Employees Occupational Illness Compensation Program Act (EEOICPA) of 2000 provides "benefits to individuals or their survivors for illnesses incurred from exposure to toxic substances while working for the Department of Energy or certain related entities." *Watson v. Solis*, 693 F.3d 620, 622 (6th Cir. 2012); *see* 42 U.S.C. § 7384, *et seq*. Eligible individuals may receive healthcare services, including home-health services and personal-care services, from designated providers that are reimbursed by the Department of Labor. *See* 42 U.S.C. §§ 7384e, 7384t; 20 C.F.R. §§ 30.400, 30.403.

Providers are also subject to state healthcare regulations. Kentucky has different requirements for providers of home-health services, i.e., "home health agencies," and providers of personal-care services, i.e., "personal services agencies." To establish a home-health agency, an entity must obtain a "certificate of need" from the Kentucky Cabinet for Health and Family Services ("KCHFS"). Ky. Rev. Stat. § 216B.061(1)(a); *id.* § 216B.015(9), (13). Home-health agencies provide "health and health related services" in a patient's place of residence "as required

by a plan of care prescribed by a licensed physician." 902 Ky. Admin. Reg. 20:081, § 2. "Health services" are defined as "clinically related services provided within the Commonwealth to two . . . or more persons, including but not limited to diagnostic, treatment, or rehabilitative services." Ky. Rev. Stat. § 216B.015(14).

To provide personal-care services, an entity must obtain certification from the KCHFS to operate a "personal services agency." Ky. Rev. Stat. § 216.712(1); *see also* 906 Ky. Admin. Reg. 1:180, § 2. A "personal services agency" is an organization "that directly provides or makes provision for personal services." Ky. Rev. Stat. § 216.710(8). The term "personal services" is defined to include assisting with ambulation and activities of daily living, facilitating the self-administration of medications, and providing attendant care; but the definition specifically excludes services "that require the order of a licensed health-care professional to be lawfully performed in Kentucky" as well as services performed by any "health-care entity or health-care practitioner otherwise licensed, certified, or regulated by local, state, or federal statutes or regulations." Ky. Rev. Stat. § 216.710(7)(b)(6), (9).

Plaintiffs' amended complaint alleges that since 2002, PCM has been providing home-health services to EEOICPA-eligible patients in Kentucky. PCM is an enrolled EEOICPA home-health care provider with the U.S. Department of Labor (DOL), and PCMK is a licensed home-health agency in Kentucky with a certificate of need to provide home-health services in four Kentucky counties. To operate this business, PCM locates eligible persons and assists them in enrolling in and obtaining benefits through the EEOICPA program; it also identifies, recruits and trains qualified home-health providers to serve patients. These activities require a considerable investment of time, effort, and money.

PCM's amended complaint alleges that neither UEW nor KEW has obtained a certificate of need in any of the four counties where PCM is licensed to operate; therefore they are not licensed home-health agencies in those counties. Nonetheless, UEW and KEW provide home-health services in those four counties. UEW and KEW solicit PCM's patients and offer free, unrelated services such as lawn care to induce patients to switch from PCM. They also misclassify their employees by classifying their nurses and other providers as independent contractors, thereby gaining an economic advantage in the market.

After an investigation, in August 2016 the Kentucky Officer of Inspector General (OIG) concluded that UEW's provision of services in Kentucky "exceeded the scope of its Personal Services Agency certification in connection with six out of six patients sampled by OIG." (R. 148, PID 1224.) That month, Falls and the Shumways formed Brightmore, which also lacks the necessary licensure, and Brightmore began providing home-health services to clients of UEW and KEW.

PCM's amended complaint asserts, in relevant part, claims of (1) unfair competition against UEW, KEW, and Brightmore; (2) tortious interference with contract and/or prospective business relations against all Defendants; and (3) civil conspiracy against all Defendants.[1] The district court granted Defendants' motion to dismiss the amended complaint for failure to state a claim. Acknowledging that the "boundaries" of an unfair-competition claim under Kentucky law "are somewhat unclear" (R. 195, PID 1655), the district court dismissed the claim because it could find no case "in which a claim of unfair competition has been successful against a competitor who allegedly has an unfair advantage in the marketplace. Rather, . . . the only cases in which unfair

---

[1] PCM also brought a claim against UEW, KEW, and Brightmore for violation of Kentucky Revised Statute 216B's requirements for home-health agencies, but PCM does not appeal the dismissal of that claim.

competition claims have been successful in Kentucky is in the realm of trademarks." (*Id.* at PID 1660.)

The district court rejected the tortious-interference-with-contract claim on the basis that the relevant contracts are at-will and thus are not breached when patients opt to switch providers. The district court found that PCM's claim of tortious interference with prospective business relations fails because the amended complaint does not plead "significantly wrongful conduct," such as "fraudulent misrepresentation, deceit, coercion, physical violence, civil suits, criminal prosecutions, or any other conduct analogous to these examples." (*Id.* at PID 1670, 1672.) In arguing that it alleged "significantly wrongful conduct," PCM relied on Defendants' alleged operation without a proper license, misclassification of their employees as independent contractors, forming Brightmore for the purpose of continuing to provide unauthorized healthcare services in Kentucky, and solicitation of PCM's patients by offering services unrelated to healthcare in violation of the federal Anti-Kickback Statute. The district court rejected these arguments. Finally, because PCM's other claims failed, the district court dismissed the civil-conspiracy claim as well.

Plaintiffs appealed.

## II.

This court reviews "de novo a district court's decision to grant a motion to dismiss for failure to state a claim under" Federal Rule of Civil Procedure 12(b)(6), construing the complaint in the light most favorable to Plaintiffs. *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 467 (6th Cir. 2017) (citing *Lambert v. Hartman*, 517 F.3d 433, 438-39 (6th Cir. 2008)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

quotation marks and citation omitted). If this court confronts a question that "has not yet been resolved by the [Kentucky] courts, we must attempt to predict what the [Kentucky] Supreme Court would do if confronted with the same question." *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003) (citing *Stalbosky v. Belew*, 205 F.3d 890, 893-94 (6th Cir. 2000)).

## A. Unfair Competition

PCM argues that the district court interpreted the scope of a Kentucky unfair-competition claim too narrowly. PCM relies primarily on two Kentucky cases, as well as several cases from other jurisdictions, in arguing that an unfair-competition claim covers the conduct alleged here, i.e., providing competing services without proper licensure and in violation of statutes.

*Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135 (Ky. 1969), involved a dispute about whether the "White House Inn" was deceptively similar to the "White House Tavern." In defining the contours of an unfair-competition claim, the Court of Appeals of Kentucky explained:

> The common law doctrine of unfair competition has long been recognized and its coverage has been expanded to meet many varying types of business conditions. A fair discussion of the principles involved appears thus in 52 Am.Jur., Trade-marks, Trade-names, Etc., section 86 (page 564):
>
> > 'Unfair competition, as a justiciable wrong under the common law, is a limited concept, although the scope of the doctrine, which has in recent years been expanded in some jurisdictions in varying degrees, cannot be precisely defined. It is a species of fraud or deceit. A universally recognized, and the most common, form or mode of unfair competition is the simulation by one person of the name, symbols, or devices employed by a business rival, so as to induce the purchase of his goods under a false impression as to their origin or ownership and thus secure for himself benefits properly belonging to his competitor.
>
> > 'As stated by some authorities, the essence of the wrong is the sale of one's own goods for those of another person, and it has sometimes been declared that nothing less than conduct tending to pass or 'palm' off one's own merchandise, services, or business as that or those of another will constitute unfair competition. According to other authorities, however, the doctrine of unfair competition is not limited to such passing off of one's

> goods, services, or business for those or that of another, but extends to others acts done or practices employed for the purpose of pirating the trade of a competitor. It has been held to apply to misappropriation as well as misrepresentation, to the selling of another's goods as one's own—to misappropration [sic] of what equitably belongs to a competitor. Also, the doctrine has been extended in many cases, especially the more recent, so as to afford protection and relief against the unjust appropriation of, or injury to, the good will or business reputation of another, even though he is not a competitor.'

*Id.* at 137-38. The Kentucky court then stated that the "Kentucky cases hereinafter cited recognize the above principles" and went on to discuss numerous cases, all of which addressed whether similar business names were deceptive. *Id.* at 138-39. "The foregoing authorities," the court explained, "collectively impel the conclusion that unfair competition consists of either (1) injuring the plaintiff by taking his business or impairing his good will, or (2) unfairly profiting by the use of the plaintiff's name, or a similar one, in exploiting his good will." *Id.* at 139. A necessary element of either theory, however, is "actual or intended deception of the public for business reasons." *Id.*

PCM highlights some of this language to argue that *Covington* recognized a broad claim of unfair competition—beyond just passing off one's goods or business for those of another—that encompasses the allegations here. Some of the language in *Covington* read in isolation supports PCM's argument, but read as a whole, *Covington* does not recognize the expansive unfair-competition claim for which PCM advocates. First, *Covington* concerned whether one business's name was deceptively similar to another's, so there would seem to be no reason for the court to determine that an unfair-competition claim extends to the actions alleged here. Second, all the cases that *Covington* discussed involved confusion of business names. *Id.* at 138-39.

Further, no Kentucky court applying *Covington* has interpreted it in the way PCM advocates. In *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866 (Ky. Ct. App.

2007), the most recent Kentucky appellate case we are aware of to apply *Covington*, the court explained:

> Originally, unfair competition "dealt generally with the palming off of one's goods as those of a rival trader. Thus, the essence of common-law unfair competition is the bad-faith misappropriation of the labors and expenditures of another likely to cause confusion or to deceive purchasers as to the source or the origin of goods." 54A Am.Jur.2d, *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 1107 (1996) (footnotes omitted). Unfair competition has since been "extended to outlawing 'parasitism' under the principle that one may not appropriate a competitor's skill, expenditures, and labor." *Id.*

*Kenney*, 269 S.W.3d at 871. Although it later acknowledged that "courts [in other jurisdictions] have held unfair competition encompasses many actions," the Kentucky court rejected the plaintiff's proposed unfair-competition claim—involving allegations that the plaintiff's former employer and one of its employees had interfered with the plaintiff's venture by telling potential customers that the plaintiff was barred from competing in certain geographic locations, *id.* at 869— because the plaintiff had not cited any Kentucky case recognizing such a claim under similar facts, *id.* at 871.

Nor do district courts in Kentucky support PCM's interpretation of *Covington*. In *Auto Channel, Inc. v. Speedvision Network, LLC*, the district court explained that "Kentucky has only recognized the claim of unfair competition in the realm of trademarks and defines unfair competition 'as passing off, or attempting to pass off, upon the public the goods or business of one man as being the goods or business of another.'" 144 F. Supp. 2d 784, 789-90 (W.D. Ky. 2001) (quoting *Newport Sand Bank Co. v. Monarch Sand Min. Co.*, 137 S.W. 784, 785 (Ky. 1911)).

In *Raheel Foods, LLC v. Yum! Brands, Inc.*, the plaintiffs, franchisees of the defendants, alleged that the defendants arbitrarily refused to approve the purchase of the plaintiffs' franchises, instead using the information about the proposed buyers obtained from the plaintiffs to sell the proposed buyers different stores or franchises. No. 3:16-CV-00451-GNS, 2017 WL 217751, at

*1-*2 (W.D. Ky. Jan. 18, 2017). In discussing the unfair-competition claim, the district court stated that "in light of *Covington Inn*, [it] is not convinced that the doctrine of unfair competition is categorically limited to the 'realm of trademarks,' [but] it does appear that most, if not all, cases applying the doctrine involve the allegation that one party is using another party's trademark with the intent to deceive the public." *Id.* at *7 n.4. Despite it being "unclear exactly how far the doctrine extends past trademarks," the district court nevertheless held that "it is clear that it does not apply here." *Id.* It explained:

> Plaintiffs' arguments to the contrary are unpersuasive. Plaintiffs maintain that unfair competition applies where there is "some competitive aspect" between the parties, and the defendant acts "unfairly in a manner which invades the plaintiffs protected rights." (Pls.' Opp'n 18-19). They contend their claim is sufficiently pled because Defendants acted unfairly by improperly interfering in their prospective business relations, which harmed their protected right to conduct their businesses. The language quoted by Plaintiffs—albeit out of context—does come from *Covington Inn*. *See Covington Inn*, 445 S.W.2d at 138. Moreover, the *Covington Inn* court did note that one form of unfair competition is "injuring the plaintiff by taking his business . . . ." *Id.* at 139. This clause however, cannot be read in isolation. The opinion as a whole does not support Plaintiffs' broad conception of unfair competition because it makes clear that actual or intended deception of the public is an "essential element" of the tort. *See id.* at 139.

*Raheel Foods*, 2017 WL 217751, at *7 (alteration in original).

Acknowledging that deception of the public is a required element under Kentucky law, PCM argues that Defendants' actions are deceptive because they do not notify their patients that they are operating unlawfully.[2] As Defendants point out, however, this allegation is not contained in PCM's amended complaint. Further, this theory of deception has no support in Kentucky caselaw, which requires that the deception relate to the source or origin of the goods or services. *See Kenney*, 269 S.W.3d at 781.

---

[2] PCM also argues on appeal that Defendants' actions were deceptive because "they have deceptively advertised misclassified positions" (Appellants' Br. at 24), but this argument was not made below and fails for the same reasons that its other deception argument fails.

PCM also relies heavily on *McCormack v. Cole*, 97 S.W.2d 33 (Ky. 1936), a case involving the dismissal of licensed taxi drivers' suit against competitors for operating without the proper certificates and permits, "whereby they were in unlawful and unfair competition with plaintiffs." *Id.* at 34. Because the trial court had not issued a reasoned decision, the Kentucky high court surmised that the trial court may have concluded "that plaintiffs could not maintain this action because the relief sought involved an injunction to prevent defendants from violating the statute with which they were charged and thereby committing a crime, and that equity would not enjoin the violation of the criminal laws of the commonwealth." *Id.* The court explained, however, that this reasoning would be erroneous "since such injunctive relief may be obtained by one who sustains property damage because of the violation" and cited two cases to support that proposition *Id.* The court continued:

> But, independently of those decisions, section 2739j-92 of the statute . . . expressly prescribes that: "Any common carrier, contract carrier [taxi drivers] or any other person, firm or corporation may, at the instance of the Commission or of any person having an interest in the subject-matter, be enjoined by the courts of this State from any violation of the provisions of this Act, or of any order, rule, regulation or requirement of the Commission." That section is section 24 of article 4 of the act . . . and it is complete authority for the maintenance of this action to obtain the relief sought by plaintiffs.

*Id.* at 34-35 (alteration in original).

PCM argues that *McCormack* recognized two independent bases for its decision: a common-law claim of unfair competition for violation of a statute, and a statutory claim. PCM reads *McCormack* too broadly in arguing that it recognized a broad claim for unfair competition based on a violation of any statute. First, the two cases *McCormack* cited both addressed the same act governing common carriers and relied on that act for authority in granting injunctive relief. *See Slusher v. Safety Coach Transit Co.*, 17 S.W.2d 1012, 1012 (Ky. 1929); *Hazard Bus Co. v. Wells*, 11 S.W.2d 413 (Ky. 1928). Second, as Defendants point out, "[n]o case since 1936 cites

*McCormack* in a discussion of unfair competition." (Appellees' Br. at 17.) Prior to citations by the district court in this action, only one case had cited *McCormack* at all, and it was for the proposition that failure to object to the joinder of defendants waives that objection. *See Bradford v. Sagraves*, 556 S.W.2d 166, 168 (Ky. Ct. App. 1977).

PCM also relies on cases from other states and the residual clause of the Restatement (Third) of Unfair Competition § 1. Some of those authorities support PCM's position that an unfair-competition claim can be based on violations of state licensure laws or civil statutes. *See, e.g.*, *Malden Transportation, Inc. v. Uber Techs., Inc.*, 286 F. Supp. 3d 264, 273-79 (D. Mass. 2017) (holding that the plaintiffs stated a valid claim of unfair competition under statutory and common law against Uber for operating its services in violation of licensing regulations and statutes); Restatement (Third) of Unfair Competition § 1 (1995) (indicating that liability for unfair competition can attach to "[o]ne who causes harm to the commercial relations of another by engaging in . . . other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public"). But these authorities do not change the fact that Kentucky cases do not appear to have adopted such a theory. Although this court may consider other states' laws and the Restatements, in determining Kentucky law the primary focus of our analysis is on prior decisions of Kentucky's highest and intermediate appellate courts, *see Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995), and, as discussed above, those cases suggest that Kentucky's concept of an unfair-competition claim is much narrower than the authorities cited.

Although the answer has not been definitively provided by Kentucky courts, the appellate caselaw in Kentucky suggests that an unfair-competition claim does not extend to PCM's

allegations here.   Accordingly, we affirm the district court's dismissal of PCM's unfair-competition claim.

### B.  Tortious Interference With Contract or Prospective Business Relationship

In general, a claim for tortious interference with a contract under Kentucky law requires pleading (1) the existence of a contract, (2) the defendant's knowledge of the contract, (3) intent by the defendant to cause a breach, (4) and conduct which caused a breach, (5) that resulted in damages, (6) in the absence of any privilege or justification to excuse that conduct.  *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5-6 (Ky. Ct. App. 2012).  The district court dismissed PCM's claim, reasoning that PCM could not adequately plead breach of any contract because PCM's contracts with its patients are at-will and are not breached when a patient chooses a different provider.  Thus, PCM's claim was more appropriately analyzed as tortious interference with prospective business relations.

An action for intentional interference with a prospective business relationship requires (1) the existence of a valid business relationship or its expectancy, (2) that the defendant had knowledge thereof, (3) that the defendant intentionally interfered, and (4) that the defendant did so with an improper motive (5) causing (6) special damages.  *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 187 (Ky. Ct. App. 2014).

The parties agree that under Kentucky law, claims against a competitor for tortious interference with an at-will contract and tortious interference with a prospective business relationship both require the plaintiff to establish that the defendant employed wrongful means.  Because PCM has not sufficiently alleged wrongful means, its claim fails under either theory.

Kentucky courts have adopted Restatement (Second) of Torts (hereafter Restatement) § 766 (1979) (addressing intentional interference with a contract and prospective contractual

relation), and § 767 (listing factors to consider in determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper). *See Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988); *see also Sparkman v. Consol Energy, Inc.*, 571 S.W.3d 569, 571 (Ky. 2019) ("[The Kentucky Supreme Court] has never strayed from the Restatement (Second) of Torts when analyzing tortious interference claims and does not elect to do so today."). And this court has predicted that Kentucky would also adopt § 768, which applies where the parties are competitors, providing:

> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
> > (a) the relation concerns a matter involved in the competition between the actor and the other and
> > (b) the actor does not employ wrongful means and
> > (c) his action does not create or continue an unlawful restraint of trade and
> > (d) his purpose is at least in part to advance his interest in competing with the other.
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

*See Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 309 (6th Cir. 2011).

In explaining the interplay between Restatement § 767 and § 768, this court held that it was proper to instruct the jury to consider the factors listed in § 767 in determining whether a party employed "wrongful means" under § 768.

> In seeking guidance, the district court properly looked to § 767, as many other courts have done, to illuminate the meaning of "wrongful" conduct under §768.

> Part of the same Restatement, § 767 immediately proceeds § 768, and both sections relate to tortious interference. Section 768 stands simply as "special application of the factors determining whether an interference is improper or not, as stated in § 767." Moreover, § 767 specifically defines "improper interference," a phrase also used in § 768, and that the Kentucky Supreme Court has interpreted to mean "wrongful," the operative word under § 768.

Finally, we address HCP's policy argument that the "district court's [ ] effort to 'blend' § 767 with § 768 diluted the competitive protections § 768 is designed to provide." We do not agree. To the extent the district court's hybrid approach *may* have increased the likelihood of liability under the facts of this case, the approach did not dilute the competitive protections of § 768. Robust competition may also require regulation, and unfair competitive practices certainly do not fall within the protections of § 768. Although courts should be circumspect in adjudicating claims between competitors, wrongful and anti-competitive conduct should not be insulated from liability. Indeed, the public interest in full and fair competition is furthered by imposing liability on a market player, such as HCP, for fraudulently leveraging a public market to sabotage a competitor, as liability for such conduct will deter similar future conduct and promote economic certainty in the marketplace.

Under these circumstances, we find that the district court properly resolved the interplay between §§ 767 and 768 as a matter of Kentucky law by instructing the jury pursuant to § 768 and also using certain factors listed in § 767 to explicate § 768.

*Ventas, Inc.*, 647 F.3d 310-11 (alteration in original) (internal citations omitted).

A comment to the Restatement § 768 explains that "[t]he predatory means discussed in § 767, Comment *c*, physical violence, fraud,[3] civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section," but "persuasion and . . . limited economic pressure" are not. Restatement § 768 cmt. (e). Restatement § 767 further identifies "unlawful conduct" as conduct that may make an interference wrongful. Restatement § 767 cmt. (c).

The parties dispute whether "wrongful means" under Restatement § 768 includes only those means specifically identified in comment (e), i.e., physical violence, fraud, civil suits and criminal prosecutions, or whether it also includes unlawful conduct, which is mentioned in § 767 comment (c). *Ventas* instructs that one must look to § 767 "to illuminate the meaning of 'wrongful' conduct under § 768." 647 F.3d at 310. And nothing in § 768 expressly limits "wrongful means"

---

[3] Defendants argue that PCM must plead wrongful means under the heightened pleading standard of Rule 9(b) to the extent that it alleges Defendants interfered by fraud or deceit. PCM does not appear to rely on fraud or deceit to establish interference. Rather, it relies on conduct in violation of multiple statutes. Therefore, we do not address this argument.

to physical violence, fraud, civil suits and criminal prosecutions. *See also Sparkman*, 571 S.W.3d at 572 (finding that "wrongful means" under Restatement § 769 includes the wrongful means discussed in § 767 comment (c) because a comment in § 769 refers back to § 767 comment (c)). Although the Kentucky Supreme Court in *Hornung* gave examples of wrongful means consisting of fraud, deceit, or coercion, it did not suggest that those were the only means that are considered wrongful under the Restatement. 754 S.W.2d at 858. Nonetheless, we do not read § 767 as creating a bright-line rule that any unlawful conduct constitutes wrongful means for purposes of bringing a tortious-interference claim. Rather, our task is to determine whether the Kentucky Supreme Court would find that the statutory violations alleged in this case qualify as wrongful means for purposes of a tortious-interference-with-prospective-business-relationship claim.

PCM cites no caselaw from Kentucky holding that a violation of a licensing statute constitutes wrongful means for a tortious-interference claim against a competitor. Most other courts that have addressed the meaning of "wrongful means" under Restatement § 768 have concluded that it requires alleging conduct that is independently actionable. *See DP-Tek, Inc. v. AT & T Glob. Info. Sols. Co.*, 100 F.3d 828, 833-35 (10th Cir. 1996) (discussing cases and concluding that "we are convinced the weight of authority supports the conclusion that the wrongful means test of section 768 requires independently actionable conduct"); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1507 (8th Cir. 1992) ("'[W]rongful means,' as those words are used in Restatement Section 768(b), 'refer[] to means which are intrinsically wrongful—that is, conduct which is itself capable of forming the basis for liability of the actor.'" (alterations in original) (quoting *Conoco, Inc. v. Inman Oil Co.*, 774 F.2d 895, 907 (8th Cir. 1985))). This formulation is consistent with the Kentucky Supreme Court's discussion of improper interference, as fraud, deceit, and coercion are potentially all independently actionable. *See* 754 S.W.2d at 858.

Here, PCM's amended complaint included a claim for violation of the home-health agency licensing statute, Ky. Rev. Stat. Ch. 216B, but the district court dismissed that claim, finding that that there was no private right of action under the statute. The district court further found that PCM could not bring its statutory claim under Ky. Rev. Stat. § 446.070, which provides in part that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation," because PCM was not in the class of persons intended to be protected by the statute and the alleged injury was not the type of injury against which Chapter 216B was designed to protect. PCM does not appeal the dismissal of that claim, thus abandoning the statutory claim on appeal. Defendants argue that allowing PCM to repackage its now-abandoned statutory claim as a tortious-interference claim would "circumvent the Kentucky Legislature's decision not to allow a private right of action to enforce its licensing rules by allowing PCM to rebrand its claim as . . . tortious interference." (Appellees' Br. at 37 n.17.)

This argument finds support in cases in other jurisdictions. For example, in *Settimo Associates v. Environ Systems, Inc.*, 17 Cal. Rptr. 2d 757, 758 (Cal. Ct. App. 1993), a contractor sued a competing contractor for being awarded contracts for projects that involved work that was outside the scope of the competitor's specialty license. The court held that the plaintiff failed to state a claim for unlawful interference with contracts:

> The Business and Professions Code which contains statutory licensing regulations neither creates nor denies any civil remedy to bidders who lose projects to unlicensed competitors. Granted, Environ's conduct amounted to a misdemeanor and foreclosed any possibility of its suing to enforce an awarded contract. However, these regulatory sections fall within the responsibility of the Contractors' Licensing Board to sanction such misconduct. They do not create any action for civil damages in a competing bidder.

*Id.* at 759 (citations omitted); *see also Warde v. Kaiser*, 887 F.2d 97, 102-03 (6th Cir. 1989) ("Even if the defendant agents committed a technical violation of [an insurance notice statute] and its implementing regulations . . . [,] nothing in Tennessee's insurance laws purports to make such a

failure actionable at the instance of a competing insurance agent. . . . [W]e do not believe that the Tennessee courts would treat the Shannons' rescission of the Midland Mutual coverage as having been procured through 'wrongful means.'"); *Whitey's Boat Cruises, Inc. v. Napali-Kauai Boat Charters, Inc.*, 132 P.3d 1213, 1223-29 (Haw. 2006), *as corrected* (Apr. 25, 2006) (rejecting claim by commercial tour boat operators against competitors for tortious interference with prospective business advantage based on the competitors operating without required county and state permits where the rules and regulations relating to those permits did not authorize private cause of action and were not enacted to protect business interests or competition); *Klinger v. Morrow Cty. Grain Growers, Inc.*, 794 P.2d 811, 812-13 (Or. Ct. App. 1990) (rejecting the plaintiff's argument that a competitor gasoline station that allowed customers to serve themselves in making gasoline purchases, in violation of a state statute that conferred no private cause of action on a competitor, engaged in "improper means" necessary to establish a tortious-interference claim: "It would make no sense for an intentional interference claim to be maintainable simply because the defendant violated a statute that has no nexus with the business or economic relationships allegedly harmed.").

Although some other courts have listed violation of a statute as an example of wrongful means, *see Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 n.5 (Tenn. 2002); *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982), *overruled on other grounds by Eldridge v. Johndrow*, 345 P.3d 553 (Utah 2015), we are not aware of any court finding wrongful means based on allegations similar to those here.[4]  Thus, although the issue is a close one, we are

---

[4] *Trau-Med* simply listed in a footnote examples of improper means and included statutory violations. 71 S.W.3d at 701 n.5.  *Leigh* held that filing two "groundless lawsuits" to damage another's business constitutes improper means, as well as breaching a contract "for the immediate purpose of injur[ing] the other contracting party" by harming its business.  657 P.2d at 308-09.  Neither case found "wrongful means" based on a licensing violation.

not persuaded that the Kentucky courts would conclude that PCM adequately pled a claim for tortious interference with prospective business relationships.

For the same reason, PCM's claim of tortious interference premised on violation of state and federal wage and hour laws also fails. PCM does not cite a case where any court has allowed a tortious-interference claim to proceed on that basis. Allowing such a claim would effectively turn competitors into enforcers of wage and hour laws. *See Lexington Nat'l Ins. Corp. v. Ranger Ins. Co.*, 326 F.3d 416, 420 (3d Cir. 2003) ("[I]f a business may assert a valid claim against a competitor for unlawfully reducing its costs by underpaying its taxes it follows that a business could assert a claim against a competitor predicated upon a theory that it is obtaining an economic advantage by underpaying its employees in violation of minimum wage act or similar laws. . . . If we hold that Lexington has pled a claim on which relief may be granted we will invite a tidal wave of litigation as businesses find opportunities to meddle in their competitors' affairs.").

PCM's final argument that a violation of the Anti-Kickback Statute[5] constitutes wrongful means is also unpersuasive. Although there have been cases allowing tortious-interference claims to proceed, or suggesting that they might succeed, under this theory, those cases are distinguishable. In *American Health Systems, Inc. v. Visiting Nurse Ass'n of Greater Philadelphia*, No. CIV.A. 93-542, 1994 WL 314313, at *2 (E.D. Pa. June 29, 1994), the plaintiff alleged that a competitor home-health agency and hospitals engaged in a scheme where the hospitals referred patients to the competitor in exchange for the competitor's payment of salaries of certain employees at the hospitals, payments which the competitor disguised, all in violation of the Anti-

---

[5] The district court found that the Anti-Kickback Statute does not prohibit inducements to patients, and therefore held that PCM's allegation that Defendants induced PCM's patients to switch providers by offering them unrelated services such as free lawn care failed to state a claim for tortious interference. On appeal, Defendants concede that, "contrary to the [district c]ourt's approach, the Anti-Kickback Statute prohibits inducements to patients as well as to providers." (Appellees' Br. at 44-45.)

Kickback Statute.  In response to the defendants' argument that the RICO claims must be dismissed because the Anti-Kickback Statute provides no private right of action, the district court stated that "defendants are not insulated from civil liability simply because their alleged fraudulent conduct also violated a criminal statute," but nevertheless struck all references to the Anti-Kickback Statute in the complaint.  *Id.* at *5.  Underpinning the court's rationale was that the claims could proceed because the complaint alleged fraudulent activity, which also happened to violate a federal statute.  Here, PCM does not argue that Defendants' alleged actions of performing lawn care for prospective patients is inherently fraudulent or tortious.  Thus, *American Health Systems* is distinguishable.

PCM also cites *Synthes (U.S.A.) v. Globus Medical, Inc.*, No. CIV.A. 04-CV-1235, 2005 WL 2233441 (E.D. Pa. Sept. 14, 2005), relying on the district court's acknowledgement in that case that some courts "have left open the possibility that conduct allegedly violating the anti-kickback statute may form the basis for liability under some recognized common law cause of action, assuming all other element of the cause of action are present."  *Id.* at *5 (quoting *Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*, No. 04-02-00188-CV, 2003 WL 21972724, at *6 n.1 (Tex. Ct. App. Aug. 20, 2003)).  But *Synthes* actually supports Defendants' position.  Although the court stated that "[t]he mere fact the Anti-Kickback provision prohibits Synthes' conduct does not mean that the same conduct cannot provide a basis for civil liability under another state or federal statute," it reasoned that the pertinent "question then is whether the underlying conduct violates Pennsylvania state law."  *Id.* at *6.  Because "[a]bsent the Anti-Kickback implications, the underlying conduct itself—i.e., sponsoring conferences, providing research grants, and offering promotional incentives—is not inherently unfair or tortious," the court held that the plaintiff could not base its tortious-interference or unfair-competition claim on

violation of the Anti-Kickback Statute. *Id.* Thus, the two cases that PCM primarily relies on are not helpful to it.[6]

Defendants cite *Synthes*, discussed above, as well as *Reliable Ambulance Service*, 2003 WL 21972724, where the court explained that it "found no other jurisdiction that has recognized an action for damages or injunctive relief based solely on the allegation that the anti-kickback statute was violated." *Id.* at *6. After citing several cases that rejected such a claim, the court cautioned that "recognizing a common law cause of action by a competitor for damages and injunctive relief for violation of the anti-kickback statute would be inconsistent with the intent of Congress." *Id.*

Although this question would be better answered by the Kentucky courts, given the existing caselaw, the absence of a private cause of action, and PCM's failure to argue how the alleged Anti-Kickback Statute violations are inherently tortious or wrongful, we conclude that the alleged Anti-Kickback Statute violations in this case do not constitute wrongful means necessary to sustain a tortious-interference claim against a competitor under Kentucky law.

Accordingly, we affirm the dismissal of PCM's tortious-interference claim.

## C. Civil Conspiracy

.        The parties agree that the viability of the civil-conspiracy claim depends on whether PCM stated an underlying, substantive tort claim. Because we conclude that the district court properly dismissed PCM's other claims, we affirm the dismissal of the civil-conspiracy claim as well.

## III.

For the reasons stated, we affirm the district court's judgment.

---

[6] PCM also cites cases that merely left open the possibility that alleged violations of the Anti-Kickback Statute could supply part of the basis for a state-law tortious-interference claim. *See State Med. Oxygen & Supply, Inc. v. Am. Med. Oxygen Co.*, 750 P.2d 1085, 1088-89 (Mont. 1988).