RENDERED:  OCTOBER 27, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0117-MR

RICHARD HOLMES                                                             APPELLANT

v.
APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE THOMAS L. TRAVIS, JUDGE
ACTION NO. 21-CI-00707

HORSE CAPITAL REALTY, LLC;
AARON KENDALL; AND SARA
ASGARI KENDALL                                                            APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  EASTON, ECKERLE, AND JONES, JUDGES.

EASTON, JUDGE:  The Appellant, Richard Holmes ("Holmes"), seeks reversal of

a summary judgment granted by the Fayette Circuit Court in favor of the

Appellees, Aaron and Sara Asgari Kendall ("Kendall")[1] and Horse Capital Realty,

---

[1] From the record, it appears much of the relevant correspondence was between Holmes and
Aaron Kendall.  We will refer to the Appellees Aaron and Sara Kendall singularly as Kendall.
We note the briefs filed in this case list only HCR as the Appellee.  We will still address the
claims against Kendall as they relate to the agency claims involving HCR.

LLC ("HCR"), in this contract dispute about the attempted sale of a residential property. Holmes also claims error in the denial of his motion to amend his Complaint to assert additional claims against HCR after summary judgment had been granted. Concluding that the circuit court properly granted summary judgment and did not abuse its discretion in denying the amendment motion, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Holmes had a house to sell in Lexington. Kendall wanted to buy this property. Both Holmes and Kendall were knowledgeable with respect to real estate transactions. Both testified about their considerable experience with properties as investments or other experience with buying and selling properties. Both Holmes and Kendall had their own real estate agents for this transaction. Holmes was represented by Sheridan Sims ("Sims"), and Kendall was represented by Brenda Winkler ("Winkler") with HCR.

Kendall made an offer of $1.45 million which Holmes accepted. The agents used an Offer to Purchase Contract ("Contract"), a standard form created by a Lexington association of realtors. The provision governing the present dispute appears under Item 3:

> BUYER agrees to apply for and lock in the above-mentioned loan within five (5) calendar days from the date of acceptance of this CONTRACT and shall proceed with due diligence to obtain financing. Should BUYER

-2-

be unable to obtain financing, this CONTRACT shall be null and void and the earnest money shall be refunded to Buyer.

Kendall made an earnest money deposit of $25,000. HCR held the deposit. The Contract anticipated a further down payment of $265,000. The "above mentioned loan" was for the remaining $1.16 million. The loan to be obtained was to be repaid over a thirty-year period with an interest rate of no more than 3%. The closing was set for November 6, 2020, forty-eight days after the contract was signed.

Before making the offer, Kendall had given to Holmes or his agent Sims an "approval notice" for $1.5 million from Statewide Mortgage ("Statewide"). This one-page preapproval was dated July 31, 2020. The approval was clearly conditioned on Kendall satisfying underwriting guidelines and the continued availability of the contemplated loan programs. Also, the preapproval had already expired after thirty days. This did not stop Holmes from entering the Contract.

Undisputed evidence from Stephen Gray ("Gray") with Statewide shows that Winkler sent the contract to Statewide on September 21, 2020, within two days of the Contract signing. Kendall sent everything Gray requested for the loan processing. Gray noted "the loan was locked in for a 30 year fixed mortgage"

on September 22, 2020.  Gray made another note dated September 23, 2020: "Loan was locked and completely structured for underwriting."

Then things went south.  Kendall was verbally informed on September 24, 2020, that Statewide had denied the loan.  Statewide issued a written denial on October 1, 2020, after the formal underwriting review.  Kendall insists the denial was because the type of loan contemplated was no longer going to be offered by Statewide.  Regardless, the documentation of the denial indicates underwriting wanted a larger down payment, and Kendall did not have sufficient available funds for a larger down payment.  The loan was denied for insufficient funds from Kendall.

Kendall immediately informed his agent Winkler, who contacted Holmes's agent Sims the very next day, on September 25, 2020.  The interaction between the two agents at this point is key to this dispute.  Sims admits conversations occurred, but he remembers (or perhaps does not remember) them the same way as Winkler.

Winkler is adamant that she told Sims about the Statewide denial.[2] When asked if Winkler specifically informed him of the denial, Sims repeatedly said "not to my recollection."[3]  Yet, after Sims spoke with Winkler and Gray with

---

[2] Winkler Depo. at 38-39.

[3] Sims Depo. at 144.

-4-

Statewide, Sims knew Kendall "would not ultimately be obtaining financing from Statewide."[4] Sims knew Kendall would be seeking other financing through another mortgage provider ("Envoy"), and Sims even suggested, more than once, that Kendall should contact other lenders for financing.[5] Sims had contact with Envoy about the loan application with them. The documentation again shows Kendall provided all requested information needed by Envoy to consider the loan with them.

Of particular significance is the fact that the discussion between Winkler and Sims led Sims to discuss with Holmes an option of not going forward with the Contract when the problem developed with Statewide.[6] Subsequent events show that Sims and Holmes decided to proceed with the Contract hoping that financing would come through.

The financing efforts with Envoy also ultimately failed just prior to the closing. The scheduled closing did not take place. Holmes then sued Kendall as well as HCR. Holmes claimed breach of contract, including the implied duty to act in good faith and with fair dealing. Holmes also claimed misrepresentation by Kendall or through the agent Winkler. Finally, Holmes made a claim of unjust

---

[4] Sims Depo. at 98.

[5] Sims Depo. at 74-75 and 127.

[6] Sims Depo. at 160-164.

enrichment. As Kendall in no way was enriched by this failed contract, we will not comment on that claim further.

Holmes's asserted claim against HCR was related to the deposit as is indicated in the demand for relief which requests only the application of the deposit held by HCR to Holmes's claimed damages. Yet Holmes clearly included Winkler in the allegations in the Complaint as to misrepresentations made.[7]

Essentially, Holmes feels Kendall or his agent Winkler should have specifically told Holmes or his agent Sims that Statewide had "denied" the loan. Holmes then supposedly would have freed himself of the Contract and tried to salvage a deal with another potential purchaser, assuming such other purchaser could obtain financing. As it is, Holmes was left with the property. It would be months before another sale could be consummated. As it turns out, Holmes sold the property for the exact same price of $1.45 million. Even so, Holmes claims over $100,000 in "carrying costs" as damages.

During the pendency of the case, the circuit court ordered the return of the earnest money deposit to Kendall by a partial summary judgment entered on July 29, 2021. Applying KRS[8] 324.111(6), the circuit court correctly ruled the deposit had to be returned. But the circuit court did not then decide the liability of

---

[7] Paragraphs 23 and 48 of the Complaint.

[8] Kentucky Revised Statutes.

anyone resulting from the alleged failures of Kendall or the agent Winkler. The circuit court succinctly stated this in its July 2021 Order.

All the actors were deposed, and the circuit court then granted summary judgment to Kendall on all Holmes's claims. There being no further claim pled against HCR other than the deposit issue, there was nothing left to determine, and the circuit court stated the claim against HCR was dismissed as well. When Holmes sought reconsideration of the summary judgment, Holmes also sought leave to amend his Complaint to allege claims against HCR directly for the alleged misrepresentations of Winkler. The circuit court denied the amendment motion and did not alter its summary judgment decision.

On appeal, Holmes contends that the circuit court should not have granted summary judgment, because there were disputed issues of material fact pertaining to his contractual claims and related misrepresentation. Holmes also believes the circuit court abused its discretion in denying the amended pleading against HCR.

STANDARD OF REVIEW

The proper standard of review on appeal when a trial judge has granted a motion for summary judgment is whether the record, when examined in its entirety, shows there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The trial judge must view the evidence in a light most favorable to the nonmoving party, resolving all doubts in its favor. Because summary judgment does not require

-7-

findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions.

*Phoenix American Adm'rs, LLC v. Lee*, 670 S.W.3d 832, 838 (Ky. 2023) (citations omitted).

With respect to the circuit court's decision not to permit the amended pleading, we review this for an abuse of discretion. *Swearingin v. Hagyard Davidson McGee Associates, PLLC*, 641 S.W.3d 186, 192 (Ky. App. 2022). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

## ANALYSIS

"A 'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." KRS 355.1-303(3). This Uniform Commercial Code provision is consistent with Kentucky common law as it applies to real estate transactions. *See Maddox-Grundy Co. v. Helm*, 37 S.W.2d 49 (Ky. 1931) (custom in real estate trade is for real estate agents to share commission when one brings the buyer and the other brings the seller even if that is not stated in the contract).

-8-

The Contract required only that Kendall "lock in" the loan within five days of the signing of the Contract. Both Sims and Winkler understood this Contract term meant a lock in of the interest rate.[9] When the United States Consumer Financial Protection Board advises consumers about the meaning of "lock in" it explains: "A lock-in or rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application."[10] Even the preapproval which Holmes now claims mislead him refers to locking in as pertaining only to the interest rate.

More to the point Holmes and his agent Sims referred to the lock in as relating to the interest rate in email exchanges[11] between them. But Holmes now argues, without specificity, that "lock in the loan" should mean something more. Basically, Holmes thinks it should mean the loan is almost guaranteed and can be relied upon to be there at closing. This interpretation would render the rest of the Contract language meaningless and ignores the realities of the loan process. The lock in of interest rate is just one step. **If** the lender is going to approve any loan,

---

[9] Winkler Depo. at 19-20; Sims Depo. at 48-49.

[10] *What's a Lock-in or a Rate Lock on a Mortgage?*, CONSUMER FINANCIAL PROTECTION BUREAU, https://www.consumerfinance.gov/ask-cfpb/whats-a-lock-in-or-a-rate-lock-en-143/#:~:text=A%20lock%2Din%20or%20rate,can%20change%20daily%2C%20sometimes%20hourly (last updated May 2, 2023).

[11] Holmes Depo. at 86-87.

the lock in simply assures one aspect and that is the interest rate for the term of the loan.  Otherwise, there would be no need for Kendall further to exercise due diligence "to obtain financing."  In the same Contract sentence as the interest rate lock in, the loan is still contingent on an appraisal and acceptance through underwriting, which would take more than the initial five days to lock in the interest rate.

Kendall did what he had to do.  He had a lock in of the interest rate, and he proceeded to obtain a loan.  When Statewide did not come through, Kendall had every right to use due diligence to find other financing before the scheduled closing.  There was no genuine issue of material fact as to the exercise of due diligence.  When a loan did not materialize for the closing, the Contract gave Kendall the right to get the deposit back.  The Contract had become "null and void" according to its express terms.

As for the duty to act in good faith and with fair dealing, Holmes leans on the inability of Sims to remember if Winkler specifically told Sims of Statewide's "denial."  Even if we were inclined to play this word game, nothing excuses the failure of Holmes and Sims to act when they clearly knew Statewide was out of the picture and financing would have to come from another source.  Again, Kendall complied with the plain terms of the Contract.  "The implied covenant of good faith and fair dealing simply 'impose[s] on the parties . . . a duty

to do everything necessary to carry' out the contract." *Harvest Homebuilder, LLC, v. Commonwealth Bank and Trust Co.*, 310 S.W.3d 218, 220 (Ky. App. 2010) (citations omitted).

Because there was no claim remaining against Kendall when the circuit court was considering the summary judgment motion, that court would then look to see what remains to be decided in the Complaint. As to HCR, nothing remained. The deposit had been returned by the prior Order. In these circumstances, there was no error in the circuit court noting no claims remained against HCR either. *See Smith v. Norton Hospitals, Inc.*, 488 S.W.3d 23, 35 (Ky. App. 2016).

The only remaining issue is Holmes's belated attempt to amend the Complaint to add more allegations directed against HCR and opposed to Kendall. Amendment is governed by CR[12] 15.01. In exercising its discretion, the circuit court considers several factors. *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866 (Ky. App. 2007). For example, the circuit court should consider any prior opportunity to assert the new claims as well as prejudice to the opposing party if the amendment is allowed. *Id*. at 869. The circuit court commented on these factors.

---

[12] Kentucky Rules of Civil Procedure.

As seen from the initial Complaint, Holmes knew or should have understood a real estate agent has more than one agency relationship. Winkler was the agent for the buyers, but she was also an agent for her realtor/broker HCR. If Holmes wanted to sue HCR because of Winkler's actions, he could have done so from the beginning rather than waiting for the correct observation by the circuit court that, if Winkler did not explain the "denial" of Statewide's loan, she would have acted contrary to the agency she had with Kendall. Instead, Holmes waited to add a claim after summary judgment had been granted and approaching two years after the filing of the initial Complaint.

At a hearing on April 28, 2022, Holmes's counsel commented on retaining an expert for criticism of Winkler's actions. A discussion of dismissing HCR without prejudice went nowhere. No action was taken to consider making further claims against HCR until after summary judgment was granted months later.

If the belated amendment had been allowed, HCR would have to begin a defense of a whole new claim which, if previously pled, could have been addressed with those already decided. The circuit court correctly assessed prejudice to HCR in denying the amendment.

The larger problem was the futility of the amendment. In the context of a real estate contract for a residence, our courts have declined to recognize a

claim for negligent misrepresentation. *See Kentucky Farm Bureau Mut. Ins. Co, v. Blevins*, 268 S.W.3d 368 (Ky. 2008). Holmes could allege fraud by omission, but there must be a legal duty to disclose a given fact. *Giddings & Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011). Holmes offers no legal authority under Kentucky law in the context of telling a seller when one loan provider officially "denies" a loan, especially in these circumstances when Sims and Holmes knew Statewide was out, and other loan providers were in play. Kendall did not have to use Statewide for financing.

An affirmative fraudulent misrepresentation claim would require Holmes to prove by clear and convincing evidence all six elements of the claim. *Id*. Even if Winkler had made an affirmatively false statement, like Statewide did not deny the loan, of which there is no evidence, reliance on that statement would have to be reasonable. Sims knew Statewide was out of the picture and that other lenders were being considered, and Sims and Holmes moved forward with the Contract and did not seek a mutual release from the Contract. Holmes had no unilateral right to anticipatorily breach the Contract when Statewide denied the loan. Kendall still had the right to proceed and try to get financing for the closing.

On this record, the circuit court correctly determined there was no genuine issue of material fact on the claims made by Holmes. The circuit court did

-13-

not abuse its discretion in denying Holmes's request to amend his Complaint. The Fayette Circuit Court is AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Marshall R. Hixson
Lexington, Kentucky

BRIEF FOR APPELLEE HORSE CAPITAL REALTY, LLC:

M. Jake Bliss
Lexington, Kentucky